# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| JULIA C. CARVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:04-CV-263 |
| | ) | (VARLAN/GUYTON) |
| WASTE CONNECTIONS OF | ) | |
| TENNESSEE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Julia Carver ("Carver") alleges that she was sexually harassed by her supervisor and then terminated in retaliation for complaining about sexual harassment by her former employer, defendant Waste Connections of Tennessee, Inc. ("Waste Connections"). Waste Connections has filed a comprehensive motion for summary judgment [Doc. 28], arguing that plaintiff's claims of discrimination and retaliation should be dismissed. The parties have filed thorough briefs and documentation in support of and in opposition to the pending motion [Docs. 29, 32, 34, 36], which the Court has carefully reviewed and considered in light of the arguments of counsel presented on November 22, 2005.

For the reasons set forth herein, the defendant's motion for summary judgment as to plaintiff's claim of hostile work environment discrimination will be granted in part and denied in part such that plaintiff may proceed on her claim as to acts or omissions occurring after Waste Connections's October 2002 corporate acquisition of the Knoxville office and denied as to plaintiff's claim of retaliation.

# I.    Relevant Facts

## A.    The Parties

Julia Carver began working as a sales representative for BFI, a waste disposal business, in its Knoxville, Tennessee office in August 1998.  During her employment, BFI was purchased by Allied Waste Industries.  In October 2002, Waste Connections, Inc., a corporation headquartered in Folsom, California, purchased the Allied Waste operation in Knoxville.  It is undisputed that Waste Connections had no involvement or relationship to the Knoxville office prior to the acquisition in October 2002.  Carver continued to be an outside sales representative for Waste Connections after this purchase.

Immediately after the purchase of the Knoxville operation, Jerri Hunt, the Vice President of Human Resources for Waste Connections, visited the Knoxville office.  She spoke to the employees about her role and the company's stand on harassment and discrimination.  She explained that Waste Connections did not allow harassment in the workplace and any employee who felt harassed should call her directly.  The record contains a copy of the Waste Connections harassment policy, which was in effect in 2002 and 2003. The policy states in pertinent parts as follows:

> Sexual harassment will not be tolerated.  Sexual harassment may include unwelcome sexual advances, requests for sexual favors, and other verbal, visual or physical conduct of a sexual nature.  Sexual harassment may also include unwelcome sexual attention, verbal abuse of a sexual nature, unnecessary touching, a display in the workplace of sexually suggestive objects or pictures, sexually explicit or offensive jokes or objects, or engaging in any sexually-oriented conduct which would unreasonably interfere with another's work performance or create a work environment that is intimidating, hostile or offensive. ...

2

> Employees who feel that they or others may have been subjected to sexual harassment, including but not listed to any of the conduct listed above, by any supervisor, management official, other employee, customer, client or any other person in connection with their employment, should bring the matter to the immediate attention of their supervisor, Manager, District Manager, Divisional Vice President or Corporate Human Resources. You may bypass any employee about whom you have a complaint. If the initial complaint is made to the supervisor, he/she is to inform the District Manager and the Corporate VP of Human Resources ... who will initiate an investigation. Allegations of harassment will be promptly investigated and appropriate corrective action will be taken.

[Doc. 28, Attach. A, Hunt Aff. at ¶ 6.] The record also indicates that Hunt conducted several training sessions for company managers on sexual harassment and the company's sexual harassment policy.

For most of Carver's years of employment and throughout her tenure with Waste Connections, Douglas McGill was Carver's sales manager and her direct supervisor. Carver claims she and other female employees were sexually harassed by McGill throughout her employment. Carver states that the effect of enduring the alleged sexual harassment perpetrated against her and observing it perpetrated on other women was "stressful, insulting, humulating [sic] and chilling." Carver further states that "[i]t created a 'sexually charged atmosphere' that was intolerable." [Doc. 34, Carver Aff. at ¶ 6.]

In order to facilitate the following legal analysis, the conduct alleged by Carver will be delineated to the extent possible between that which occurred prior to Waste Connections's purchase of the Knoxville office and that which occurred after the purchase.

3

B.    Pre-Purchase Conduct

Carver contends that McGill used profanity "almost on a daily basis in different contexts," including the words "f***" and "f***ing." [Doc. 30, Carver dep. at 200-201.] Carver testified that on one occasion McGill referred to a broker for Knox County Schools as a "c***." [*Id.* at 202, 204.] Carver also contends that McGill told jokes of a sexual nature, although she cannot describe any such jokes nor recall the number of times he made such jokes. [*Id.* at 156.]

McGill admits that he used profanity in the office while he was the sales manager. He states that he used profanity in a variety of situations, including referring to customers, vendors, and events in the office. He also admits that he may have said "f***" and "f***ing" in connection with those situations. McGill believes that he swore in front of men and women in the office. [Doc. 28, Attach. B, McGill Aff. at ¶ 5.] Several other witnesses have testified that they have also heard McGill use profanity in a variety of situations and in front of both women and men.

Carver claims that McGill hugged her and kissed her on the lips at a Christmas party at McGill's house in December 2001. [Doc. 30, Carver dep. at 126.] She also claims that she observed him kiss two other employees, Kim Toney and Karen Glass, at the same party. [*Id.* at 131.] Carver believes she saw McGill hug Elaine Clark, also an employee, at this party. [*Id.* at 132-33.]

4

During a 2001 sales function at the Copper Cellar restaurant, Carver claims that McGill told her he loved her and that she was the best sales representative he ever had. She states he then gave her a hug and a kiss. [*Id.* at 139-40.]

In approximately February 2002, plaintiff went on a sales call with McGill to Luxury Townhouse Management and, speaking about a secretary in the office, McGill said he would like to "bend her over." [*Id*. at 171, 173.]

At a June 2002 sales dinner at the Calhoun's on the River restaurant, Carver states that McGill hugged and kissed both her and Kim Toney on the lips as they were leaving. [*Id*. at 133-34.] Carver also testified about an incident between McGill and Amy Massengale following this dinner, which was relayed to Carver by Massengale the following work day. Because McGill was too intoxicated to drive, Massengale drove him to the Holiday Inn on Henley Street. McGill reportedly asked Massengale if she would ever leave her husband for him and if she would have oral sex with him. [Doc. 30, Carver dep. at 175-76.]

Carver testified that Amy Massengale told her that McGill said the woman who received the position as a construction representative got the job because her breasts were larger. [*Id*. at 149-50.] Carver believes this comment was made in 2002 before Waste Connections took over the Knoxville office.

Also during 2002, Kim Toney relayed to Carver that Toney was in McGill's office and she put a coat on. McGill then reportedly said to Toney, "don't do that, I like what I'm seeing." [*Id*. at 186.] Carver believes that this incident occurred prior to Waste Connections's acquisition of the Knoxville office. [*Id*. at 187.]

5

A similar incident occurred in 2002 during a sales meeting, although plaintiff cannot state whether it was before or after Waste Connections's purchase of the Knoxville operation. Plaintiff and several other employees were in a sales meeting and asked to turn the heat on because they were cold. McGill said that he liked it cold because that way he could see their nipples. [*Id*. at 189-90.]

C.    Post-Purchase Conduct

Carver testified that in approximately late 2002 or early 2003 she was told by Karen Glass that McGill had made inappropriate comments to Glass and that he would rub her shoulders. [*Id*. at 181-82.] Carver also testified that she heard McGill make jokes about Karen Glass breast feeding and her breast pump. [*Id*. at183-85.] Glass disputes that such comments were made. [Doc. 28, Glass Aff. at ¶ 3.]

At a holiday party at McGill's house in December 2002, Carver contends that gifts of a sexual nature, including edible underwear and a blow-up doll, were exchanged as part of a group gift exchange. Carver contends that the doll was inflated and displayed during the party with a hot dog in the vaginal hole of the doll. [Doc. 30, Carver dep. at 157-58.] There is no evidence that McGill brought these gifts or received them, or that he displayed the blow-up doll, although he reportedly said "that was his doll, that he was taking the doll." [*Id*. at 161.]

In April 2003, Carver found a document entitled "Application for Permission to Date Douglas McGill" in her office mail box. [*Id*. at 152-54.] Apparently, copies of this application were placed in several employees' mail boxes, although McGill testified that he

6

did not distribute them. The application, a copy of which is contained in the record, is a four-page document requesting a variety of information such as date of birth, height, weight and measurements, and questions such as: "How many trout can you gut in 4 minutes?"; "How many four wheelers do you own?"; "Attach your recipe for deer sausage."; "Do you like yard work?"; "In what row and section are your season tickets to U.T. football games located?"; "Do you shave your underarms and legs?"; "Can you tie a cherry stem in a knot using only your tongue?"; and "Can you scratch your right ear with the inside of your right ankle?". [Doc. 34, McGill Ex. 4.]

Also in April 2003, plaintiff attended a sales function at Benson Henry's house where McGill stroked her hair and said that she had beautiful hair. [Doc. 30, Carver dep. at 167.] Carver states that she immediately pulled away and McGill said, "I was just giving a ... compliment, g\*\*damnit." [*Id*.] Carver further claims that Benson Henry, the Assistant Division Manager for Waste Connections, was present when this occurred, although Henry disputes this.

D.     Plaintiff's Complaint

On or about April 10, 2003, plaintiff went on a sales call with Benson Henry. [*Id*. at 206.] Carver described her conversation with Henry as follows:

> I told Benson that there was a problem in the sales department. And when he asked me what the problem was, I said "the problem is Doug McGill." I told him that Doug McGill should not be a manager over people, that his behavior, his harassing behavior, his hostility towards me specifically had reached a point where I felt like I needed to talk to him about it. I had obviously tolerated it for quite a while and it seemed to be getting worse. ...

7

And I asked him if he could, you know, keep it confidential, that I obviously didn't want to be retaliated against by reporting him. Because it took a lot for me to talk to him about the issues that I was experiencing and that others were experiencing as well. ...

I also told Benson towards the end of the conversation when we got back, we were still in my car, that, you know, it wasn't just me that was experiencing problems, that there were others, and I gave an example of Kim Bankston. ...

It was my knowledge, from I had been told from someone else, that she was throwing up every morning not wanting to come into work because she was miserable. She didn't want to have to work with Doug, and that he had tried to ask her out on a date, or that he was trying to get her to go out with him. And I did mention that to Benson.

[Doc. 30, Carver dep. at 207-209.] When asked if she recalled anything else she said to Henry, plaintiff testified, "Just that Doug was – Doug's behavior had reached a point where it was very hostile, harassing, and that I was just kind of reaching out at that point ... to make him aware of it." [*Id*. at 209.] Carver testified that Henry told her "he was going to try to make things better for me, to hang in there. ...[H]e was put here, he was hired to make things better." [*Id*. at 207-208.] Carver did not see Henry again until she was terminated on May 7, 2003. Carver claims that McGill treated her differently following her complaint to Henry, although she admittedly has no facts that Henry told McGill of her complaint. [*Id*. at 254.]

E.   Plaintiff's Termination

Waste Connections sold their products and services in Knoxville directly to individual customers, as well as through brokers who arranged sales on behalf of their clients. Prior to approximately January 2003, sales representatives could sell to both individual accounts and brokers. In early 2003, sales representatives were instructed that all broker accounts would

thereafter be handled only by the two sales administrators, Karen Glass and Kim Key. [Doc. 28, McGill Aff. at ¶ 6.] Carver admits that she was aware of this instruction.

In April 2003, Carver claims that she was called by a broker and asked to help with a potential sale. Carver then negotiated a deal with the broker resulting in a new contract for Whittle Springs and a renewal contract for Nottingham North. Carver secured the renewal contract by granting a price reduction, also known as a "rollback." Carver gave the Whittle Springs contract to Kim Key to enter the contract into the system. On the Nottingham North contract, plaintiff first crossed out her sales code at the top of the contract and made a copy of it. She then entered Kim Key's sales code on the original contract, thus signifying that the contract was a broker deal, and added the code "CMC" indicating that the price had been reduced. Carver did not sign the original contract; instead, she gave it to Key to sign and process. Carver then submitted her copy of the contract, without Key's sales code or a price reduction code, for a commission.

At the end of each month, McGill and Karen Glass would review the contracts that the sales representatives and administrators submitted for commission credit. [Doc. 28, McGill Aff. at ¶ 7.] McGill and Glass discovered the original Nottingham North contract with Key's signature and the copy of the same contract with Carver's signature. After questioning Carver about the contract and the price reduction, McGill told her that he had agreed on higher rates with this broker and that Carver should never deal with the broker again. McGill also threatened her with termination.

9

McGill showed the Nottingham North contracts to Chris Ruane, Waste Connections's Division Manager, and explained what Carver had done. Ruane reviewed the contracts and discussed them with Henry. They concluded that Carver was insubordinate for dealing with a broker despite explicit instructions not to do so, and further that she had attempted to receive a commission to which she was not entitled.

Around this same time, late April 2003, Ruane received a directive from the Regional Vice President to lay off some employees due to the Company's poor financial situation. In order to comply with this directive, Ruane, Henry, and McGill agreed to terminate two low performing sales representatives, Eric Herron and Mack Mason. Before they could carry out the terminations, however, Ruane and Henry learned of Carver's conduct with the Nottingham North contract. They decided to terminate Carver in lieu of Herron and did so on May 7, 2003. Mason was also terminated. McGill completed a separation notice indicating that plaintiff was discharged for "theif [sic] on commissions." [Doc. 34, McGill Ex. 22.] It is undisputed that Carver never received the commission she sought.

In September 2003, plaintiff filed a charge of discrimination with the Tennessee Human Rights Commission. After receiving plaintiff's charge of discrimination, Hunt conducted an investigation of Carver's allegations at the Knoxville office. McGill was disciplined as a result of that investigation.

10

## II.   Analysis

### A.   <u>Standard of Review</u>

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing there is no genuine issue of material fact lies upon the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, and determine the truth of the matter. *Id.* at 249. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any

11

genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

      B.     <u>Successor Liability</u>

The initial legal issue presented is whether Waste Connections can be held liable for any conduct which occurred prior to its October 2002 purchase of the Knoxville facility. Waste Connections argues that it cannot, while plaintiff argues that it can. Both parties point to *Rabidue v. Osceola Refining Co.*, 805 F.2d 611 (6th Cir. 1986), *overruled on other grounds*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993), as the leading Sixth Circuit authority on successor liability.

In *Rabidue*, the Sixth Circuit reviewed a district court's judgment in favor of the defendant following a bench trial, including the district court's ruling that the defendant was not liable for any pre-acquisition discrimination. The plaintiff had been employed by Osceola Refining Company, which was subsequently acquired by Texas-American Petrochemicals, Inc., the corporate defendant in the lawsuit. 805 F.2d at 614. The *Rabidue* Court noted that the issue of successor liability was determined by the previous decisions of *Wiggins v. Spector Freight Sys., Inc.*, 583 F.2d 882 (6th Cir. 1978), and *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974). *MacMillan* set forth a nine factor balancing test to evaluate successor liability for purposes of Title VII. 503 F.2d at 1094. The *Rabidue* Court observed that *Wiggins* reaffirmed the balancing test set forth in *MacMillan* with the following caveat: "upon a factual finding that (1) charges of discrimination had not been filed with the EEOC at or before the time of acquisition, and (2) the successor had no

notice of contingent charges of discrimination at or before the time of acquisition, the case was removed from the rationale of *MacMillan* and successor liability would not attach." *Rabidue*, 805 F.2d at 616 (citing *Wiggins*, 583 F.2d at 886). Applying this standard to the facts in *Rabidue*, the Court noted that there were no charges of discrimination filed or pending before the EEOC at or before the time of Osceola's acquisition by Texas-American, and further that Texas-American was unaware of any outstanding or contingent charges of discrimination at or before its acquisition of Osceola. Thus, the Sixth Circuit concluded that the district court correctly held that Texas-American was not legally responsible for any claims of discrimination or harassment prior to its acquisition of Osceola. *Id*.

In the present case, Waste Connections argues that Carver had not filed any charge of harassment or discrimination prior to the October 2002 purchase and therefore any alleged harassment occurring prior to that time cannot form the basis of an actionable harassment claim. Plaintiff argues that application of the successor doctrine does hold Waste Connections liable for the practices of its predecessors, Allied Waste and BFI. Plaintiff points to two prior lawsuits alleging sexual harassment against BFI, and to two memos which purport to discipline McGill for various conduct prior to the Waste Connections acquisition. Defendant argues that this evidence does not avoid the application of *Rabidue*.

The record contains copies of two complaints asserting claims of sexual harassment and discrimination against BFI and Cecil Stallard, one filed by Eddina J. Williams in the Knox County Circuit Court and the other filed in this Court by Cheryl Ann Tipton, Tammy Lanning, Mary V. Conn, and Brenda Sue Wallace [Doc. 34, Attach. 14, 15]. Both

complaints relate to BFI's Knoxville facility and appear to have been filed prior to Waste Connections's October 2002 purchase of the Knoxville operation. The complaints contain no reference to either Carver or McGill. Plaintiff argues that *Rabidue* imposes no requirement that *she* have filed a pre-acquisition charge of discrimination or that a pending charge of discrimination complain of conduct *by McGill*. In other words, Carver seems to argue that any complaint of similar conduct by any plaintiff against any employee of the defendant is sufficient to satisfy *Rabidue*. The defendant argues that *Rabidue* requires that a pending charge of discrimination be filed by the plaintiff against McGill for successor liability to attach.

The Court observes that *Rabidue* does not specifically answer this question. However, the Court finds the argument proffered by the defendant to be persuasive. The rationale for setting limits on successor liability is premised on whether it is fair or reasonable to hold a successor corporation liable for the acts of a predecessor corporation. Obviously, when there are no pending charges of discrimination at or before the time of acquisition, the successor corporation would not be on notice of any alleged harassment or discrimination and therefore would not have the opportunity to remedy the situation. In the present case, the prior lawsuits allege sexual harassment by another manager, not McGill, against other women, not Carver. Even assuming that Waste Connections was aware of these lawsuits at or before the time of acquisition, the Court is hard pressed to comprehend how this knowledge could have alerted the defendant to the alleged actions of McGill toward Carver. The Court can find no legal basis to impose an inferential burden on the defendant such that knowledge of potential

14

harassment by one employee necessarily means that other employees may also be committing unlawful harassment. The Court instead believes that the decision in *Rabidue* leads to the contrary conclusion.

It is also clear that plaintiff cannot satisfy the second factor in *Rabidue*, that is, there is no evidence that Waste Connections had any knowledge of these lawsuits prior to the purchase. This conclusion is supported by the testimony of Jerri Hunt, the Vice President of Human Resources, who testified only that, "[w]hen I arrived at Knoxville I heard that there was a – there was this issue with the employer and the last manager." [Doc. 34, Hunt Dep. at 23.] It is undisputed that Hunt came to the Knoxville facility shortly after the purchase. Yet, there is no testimony by her regarding any knowledge of these lawsuits at or before the time of the purchase. Plaintiff presents only her bare assertion that Waste Connections was aware of these lawsuits "at or before the time of acquisition." *See Rabidue*, 805 F.2d at 616. Under these circumstances, these lawsuits are insufficient to hold Waste Connections liable for any alleged harassment prior to the October 2002 purchase.

The record also contains two memos regarding an investigation of McGill by Allied Waste, apparently in response to complaints by a former employee, Jewel Brown. The first memo, dated August 1, 2002, is from Scott Madding to Bob Cable with the subject line "Doug McGill – Investigation Conclusions and Recommendations." [Doc. 34, McGill Exs. 13-15.] The memo appears to summarize an investigation into a variety of complaints made by Brown about McGill. The memo does not reference specific complaints of sexual harassment, although it does describe McGill's "regular use" of the "sexually offensive 'F',"

15

'F-ing.'" The memo contains a summary of the complaints about McGill, a summary of the investigator's findings, and recommendations for improvement. There is no evidence that McGill received a copy of this memo or that he was aware of its existence prior to his deposition in this case.[1] The second memo, dated August 2, 2002, is from Bob Cable to McGill with the subject line "Final Written Warning." [*Id.*, McGill Ex. 16-17.] This memo appears to be the communication to McGill of the recommendations for improvement set forth in the August 1, 2002 memo. The August 2, 2002 memo requires, among other things, that McGill immediately undertake "[t]he cessation of profanity, with emphasis on "f" words and racial references." [*Id.* at Ex. 16.] The memo contains no other reference to conduct arguably similar to that of which Carver complains.

As with the prior lawsuits, plaintiff contends that the memos are evidence of sexual harassment by McGill at the Knoxville site and that Waste Connections should have been aware of his "final warning" only two months prior to the purchase. However, again, the memos do not reflect complaints by Carver or that Carver was interviewed regarding McGill's behavior. Moreover, there is no evidence in the record before the Court that Waste Connections was aware of these memos at or before the purchase of the Knoxville operation. Accordingly, following the standard set by *Rabidue*, Waste Connections is not liable for any alleged harassment which occurred prior to its October 2002 acquisition of the Knoxville operation.

---

[1]Plaintiff suggests that the Court should not believe McGill's testimony that he never received a copy of these memos prior to her lawsuit. However, the Court cannot make credibility determinations in reviewing a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

C.    Post-Acquisition Harassment

After concluding that plaintiff cannot recover for any alleged pre-purchase harassment, the next issue is whether the post-purchase conduct of which she complains is sufficient to state a claim for hostile work environment harassment.

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex... ." 42 U.S.C. § 2000e-2(a)(1). It is well settled that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).

To establish a prima facie case of a hostile work environment based on sex, a plaintiff must show that:

(1)    she is a member of a protected class;
(2)    she was subjected to unwelcome sexual harassment;
(3)    the harassment was based on her sex;
(4)    the harassment created a hostile work environment; and
(5)    the employer is vicariously liable.

*Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005); *Williams v. General Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999). Once an employee has established actionable discrimination by a supervisor involving no tangible employment action, an employer can escape liability only if it can establish the following affirmative defense: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that the plaintiff employee unreasonably failed to take advantage

17

of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). It is worth noting that the affirmative defense is not available when a supervisor's harassment culminates in a tangible employment action such as discharge, demotion, or undesirable reassignment. *Id.* at 808. In the present case, there is no allegation that McGill's alleged harassment resulted in a tangible employment action. Rather, plaintiff specifically alleges that her termination was the result of retaliation for complaining about harassment.

Waste Connections argues that plaintiff cannot satisfy a prima facie case of sexual harassment because the alleged conduct was not "because of" her sex, and further, that it was not severe or pervasive such as to create a hostile work environment. The standard for determining whether harassing conduct rises to the level of actionable discrimination is "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). Moreover, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787 (citing *Harris*, 510 U.S. at 21-22). There is no dispute that Carver subjectively believed McGill's conduct to be hostile and offensive.

In order to determine whether an environment is objectively hostile or abusive, courts are instructed to consider the "totality of the circumstances." *Williams v. General Motors*

18

*Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). That is, the Court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher*, 524 U.S. at 787-788 (quoting *Harris*, 510 U.S. at 23). Title VII was not, however, intended to be "a general civility code," thus, merely offensive or boorish behavior does not rise to the level of actionable harassment. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); *see Faragher*, 524 U.S. at 788 ("conduct must be extreme to amount to a change in the terms and conditions of employment"). Rather, "[a]*ny* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile work environment in violation of Title VII." *Williams*, 187 F.3d at 565 (emphasis in original).

Having determined that Waste Connections may not be liable for any pre-purchase conduct, the Court must next assess which post-purchase conduct is admissible as it is clear that only admissible evidence may be considered in reviewing defendant's motion for summary judgment. Fed. R. Civ. P. 56(e); *Carter v. University of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003) ("If the [offered] comments are deemed to be hearsay, then the evidence could not be considered on summary judgment."); *Jacklyn v. Schering Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment"). Because much of the evidence as currently proffered by plaintiff is inadmissible for purposes of summary judgment consideration, the Court will attempt to delineate the inadmissible evidence from the admissible evidence as follows.

19

1. Inadmissible Evidence

Carver asserts that McGill made inappropriate comments to Karen Glass and rubbed her shoulders. [Doc. 30, Carver dep. at 181-182.] This evidence, however, is hearsay and therefore may not be considered in opposing a motion for summary judgment. *Carter*, 349 F.3d at 274; *Jacklyn*, 176 F.3d at 927. Similarly, Glass testified that McGill asked her to go out with him, asked her if she would name her son after him, and asked if her husband died would he be next in line. [Doc. 34, Glass dep. at 34.] Glass also testified that McGill hugged and kissed her. [*Id.* at 38.] There is no evidence, however, that Carver was aware of this conduct at the time it occurred and it is therefore irrelevant to plaintiff's hostile environment claim for summary judgment purposes. *Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir.), *cert. denied*, 531 U.S. 928 (2000).

During her deposition, Carver made reference to fellow employee Kim Bankston throwing up before work because of McGill and that McGill had tried to get Bankston to go out with him. [Doc. 30, Carver dep. at 208-209.] There is no evidence that Carver was aware of these actions at the time they occurred and they too are irrelevant at this stage to her hostile environment claim. *Burnett*, 203 F.3d at 981. Moreover, Carver's recitation of these events from Bankston is hearsay and inadmissible. *Carter*, 349 F.3d at 274; *Jacklyn*, 176 F.3d at 927.

Carver next relies on Karen Glass's testimony that Jewell Brown left Allied Waste because of McGill's conduct. [Doc. 34, Glass dep. at 46.] This evidence too is hearsay. *Carter*, 349 F.3d at 274; *Jacklyn*, 176 F.3d at 927. Further, there is no evidence that Carver

20

was aware of this conduct at the time it allegedly occurred. *Burnett*, 203 F.3d at 981. Similarly, Kim Toney testified that McGill touched, hugged and kissed her; that "he grunted in animal-like behavior;" that he made comments about her clothes or appearance; that he preferred she not wear a jacket; and that if necessary she would need to offer sexual favors to keep an account. [Doc. 34, Toney dep. at 15-17, 36-37.] Again, however, there is no evidence in the record before the Court that Carver was aware of the conduct alleged by Toney so that it will not be considered for purposes of summary judgment. *Burnett*, 203 F.3d at 981.

Finally, Carver relies on Tom Saylors's testimony that McGill discussed his erectile bleeding problem in front of employees. [Doc. 34, Saylors dep. at 65.] As before, there is no evidence that Carver was aware of this comment at the time it was made, and it is therefore irrelevant to her claim. *Burnett*, 203 F.3d at 981.

2. Admissible Evidence

First, the Court observes that Carver relies on some evidence which, although admissible, defendant contends is too vague or conclusory to be considered for purposes of assessing defendant's motion for summary judgment. In general, conclusory statements are insufficient to overcome summary judgment. *Martin v. Boeing-Oak Ridge Co.*, 244 F. Supp.2d 863, 873 n.5 (E.D. Tenn. 2002) (citing *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990)). Carver contends that McGill told jokes of a sexual nature, although she cannot describe any such jokes nor recall the number of times he made such jokes. [Doc. 30, Carver dep. at 156.] Carver also claims she was present in the break room

21

when McGill made a joke about Glass's use of a breast pump. [Doc. 30, Carver dep. at 184.] Carver believes this occurred in late 2002, after Waste Connections purchased Allied Waste. [*Id*.] Although Carver claims to have overheard this comment, she does not recall what McGill said or further describe his comments. In light of the Court's conclusions below concerning the existence of admissible facts sufficient to defeat defendant's motion for summary judgment on plaintiff's claim of hostile work environment discrimination, the Court deems it unnecessary to consider these particular facts at this time in assessing defendant's motion.

Plaintiff also complains of McGill's frequent use of profanity, including the words "f\*\*\*" and "f\*\*\*ing."[2] [Doc. 30, Carver dep. at 200-201.] Neither McGill nor Waste Connections disputes that McGill frequently used profanity in the workplace. However, the present testimony is that McGill used these words in a variety of situations and in front of both male and female employees. While McGill's language may be characterized as offensive or inappropriate, there is no evidence currently before the Court that his use of profanity was directed toward only female employees or otherwise "because of ... sex." *Oncale*, 523 U.S. at 80. McGill's use of profanity will therefore not be considered at this

---

[2]It is worth noting that plaintiff claims McGill used profanity "[a]lmost on a daily basis." [Doc. 30, Carver dep. at 201.] Thus, while she has not specifically alleged that McGill's use of profanity occurred after Waste Connections's October 2002 purchase of the Knoxville facility, the Court finds that to be a reasonable inference from her testimony, viewing the facts in the light most favorable to the plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

stage of the proceeding in assessing whether plaintiff can establish a prima facie hostile work environment claim.

Thus, in the present case, there are four incidents which will be considered by the Court in assessing whether plaintiff has alleged an actionable harassment claim such as to withstand defendant's motion for summary judgment. First, Carver alleges that McGill refused to turn the heat on in a 2002 sales meeting and made sexually offensive comments as a result. She does not recall whether this meeting occurred before or after the purchase. [Doc. 30, Carver dep. at 190.] Giving plaintiff the benefit of all inferences, the Court will assume that this incident occurred after the October 2002 purchase. Second, plaintiff asserts that sexual gifts, including a blow up doll and edible underwear, were exchanged at a Christmas party for the sales staff at McGill's house in December 2002. Third, Carver contends that she found an "Application for Permission to Date Douglas McGill" in her office mail box in April 2003. Fourth, plaintiff claims that McGill stroked her hair at a social gathering in April 2003. The Court will consider each of the incidents, while "mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility." *Williams*, 187 F.3d at 563.

Carver first testified that, in at least one sales meeting in 2002, McGill refused to turn the heat on and said he "liked it cold because that way he could see our nipples." [Doc. 30, Carver dep. at 189-190.] The Court agrees that this incident is inappropriate, humiliating to female employees, and objectively offensive.

Plaintiff next testified that sexual gifts, including a blow-up doll and edible underwear, were exchanged at a Christmas party for the sales staff at McGill's house in December 2002. During the course of the evening, someone inflated the blow-up doll and hung it in one of the rooms with a hot dog in the vaginal hole of the doll. There is no evidence that McGill purchased either of these gifts or that he hung the doll up, although plaintiff testified McGill said "that he was taking the doll." [Doc. 30, Carver dep. at 161.] Plaintiff was not the recipient of either of these gifts, although she testified that she and Kim Toney were shocked by the blow-up doll. The Court agrees that this incident is juvenile, inappropriate, and offensive. While there is no evidence that the blow-up doll was directed toward plaintiff or the other female employees, one can easily assume that it was more offensive to the female employees present than to the male employees and thus contributed to the creation of a hostile work environment.

Plaintiff also testified that the "application," or "dating survey," appeared in her office mail box one day in April 2003. [Doc. 30, Carver dep. at 152.] She testified that she was told by Kim Toney that McGill distributed the surveys in several employees' mail boxes. Plaintiff found the survey "to be highly offensive and ... inappropriate." [*Id*.] As noted previously, the application requests a variety of information such as date of birth, height, weight and measurements, and questions such as: "How many trout can you gut in 4 minutes?"; "How many four wheelers do you own?"; "Attach your recipe for deer sausage."; "Do you like yard work?"; "In what row and section are your season tickets to U.T. football games located?"; "Do you shave your underarms and legs?"; "Can you tie a cherry stem in

a knot using only your tongue?"; and "Can you scratch your right ear with the inside of your right ankle?". Some of the questions can reasonably be interpreted as sexually related. Some of the questions appear to be making fun of McGill. On the whole, the Court finds that the application is inappropriate for the workplace and that a reasonable jury could conclude the application constitutes evidence of discrimination "because of ... sex." *Oncale*, 523 U.S. at 80.

Finally, plaintiff testified that McGill stroked her hair and said that she had beautiful hair at a social gathering at Benson Henry's house in April 2003. [Doc. 30, Carver dep. at 167.] Plaintiff testified that she immediately backed away and McGill then complained that he was just giving her a compliment. [*Id*.] Carver testified that Kim Toney, her husband, and Benson Henry witnessed this incident. Taking plaintiff's testimony as true, the incident is of a more serious nature since it involves unwanted touching. *See Williams*, 187 F.3d at 563 (conduct was "not merely crude, offensive, and humiliating, but also contained an element of physical invasion"). Thus, the Court again concludes that McGill's conduct was inappropriate and that a trier of fact could view this incident as contributing to an actionable hostile work environment.

Considering the complained-of conduct together, as the law requires, plaintiff has complained of the "cold room" incident and McGill's corresponding statement, display of a sexually offensive blow-up doll at a Christmas party, receipt of an offensive dating survey, and one unwanted touching, all occurring from October 2002 through April 2003. Taken as a whole, the Court concludes that these incidents can be viewed as objectively hostile such

as to alter the terms or conditions of plaintiff's employment and create a prima facie case of a hostile work environment. *Williams*, 187 F.3d at 564 ("a work environment viewed as a whole may satisfy the legal definition of an abusive work environment, for purposes of a hostile environment claim, even though no single episode crosses the Title VII threshold.").

After concluding that plaintiff can satisfy a prima facie case, the Court must now address whether Waste Connections can satisfy the two-part *Faragher* affirmative defense. As noted previously, the *Faragher* affirmative defense allows an employer to escape liability after the plaintiff has established actionable discrimination if the employer can establish the following: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

Waste Connections argues that it exercised the required care to prevent harassment, but that plaintiff failed to complain. Specifically, Waste Connections relies on its policy prohibiting sexual harassment and the complaint mechanism contained therein. Plaintiff admittedly received a copy of the policy and read it. Waste Connections also points to the fact that Hunt discussed the harassment policy with the Knoxville employees shortly after the acquisition of that facility. Thus, Waste Connections contends that these facts satisfy the first prong of the *Faragher* affirmative defense. Although plaintiff suggests that a reasonable jury could conclude that Waste Connections's harassment policy was not enforced, the Court finds that Waste Connections has satisfied this aspect of the affirmative defense. *Collette v.*

*Stein-Mart, Inc.*, 126 Fed. Appx. 678, 685, 2005 WL 293662 at *7 (6th Cir. Feb. 8, 2005)

("giving employees written notice of such [anti-harassment] policies and how they are

enforced constitutes an adequate general preventive measure"); *Leugers v. Pinkerton Security*

*& Investigative Servs.*, 205 F.3d 1340 (Table), 2000 WL 191685 at *3 (6th Cir. Feb. 3, 2000)

(defendant satisfied first element of affirmative defense by demonstrating that it had and

distributed an anti-harassment policy with a complaint procedure in place that included ways

to bypass an immediate supervisor in making a complaint).

The parties dispute whether Waste Connections can satisfy the second element of the

affirmative defense, that is whether plaintiff "unreasonably failed to take advantage of any

preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Faragher*, 524 U.S. at 807. In this case, the question is whether plaintiff complained of the

alleged harassment. Waste Connections argues that plaintiff never relayed her complaints

about McGill to any manager or to Human Resources. Waste Connections further argues that

plaintiff never advised Henry that she was being *sexually* harassed, that McGill made *sexual*

comments to her, or that he acted toward her in a *sexual* manner. Plaintiff, of course, points

to her conversation with Benson Henry as evidence that she did follow the company's

complaint procedure and that Henry did nothing about it.

Given the importance of this point, it is worth restating Carver's testimony as to her

conversation with Henry:

> I told Benson that there was a problem in the sales department. And when he
> asked me what the problem was, I said "the problem is Doug McGill." I told
> him that Doug McGill should not be a manager over people, that his behavior,

27

his harassing behavior, his hostility towards me specifically had reached a point where I felt like I needed to talk to him about it. I had obviously tolerated it for quite a while and it seemed to be getting worse. ...

And I asked him if he could, you know, keep it confidential, that I obviously didn't want to be retaliated against by reporting him. Because it took a lot for me to talk to him about the issues that I was experiencing and that others were experiencing as well. ...

I also told Benson towards the end of the conversation when we got back, we were still in my car, that, you know, it wasn't just me that was experiencing problems, that there were others, and I gave an example of Kim Bankston. ...

It was my knowledge, from I had been told from someone else, that she was throwing up every morning not wanting to come into work because she was miserable. She didn't want to have to work with Doug, and that he had tried to ask her out on a date, or that he was trying to get her to go out with him. And I did mention that to Benson.

[Doc. 30, Carver dep. at 207-209.] When asked if she recalled anything else she said to Henry, plaintiff testified, "Just that Doug was – Doug's behavior had reached a point where it was very hostile, harassing, and that I was just kind of reaching out at that point ... to make him aware of it." [*Id*. at 209.][3]

Notably, Waste Connections cites no authority for the proposition that Carver's complaint to Henry had to specifically advise him that she was complaining of *sexual* harassment for purposes of the *Faragher* affirmative defense, and the Court has found no authority to that effect. Instead, the Court notes that plaintiff used the terms "harassing" and

---

[3]Henry testified that plaintiff complained that McGill was "ugly, his personality is ugly, he's a bully, he's a tyrant, he's difficult, you know, maybe – I don't know – to the point of I hate working for him." [Doc. 28, Henry dep. at 63.] However, the Court accepts plaintiff's version of the conversation as true for purposes of summary judgment.

28

"hostile" in the context of complaining about a male manager's behavior toward her and other female subordinates. Further, plaintiff advised Henry that McGill had tried to persuade Kim Bankston to go on a date with him, conduct that would alert most employers of possible Title VII implications. Accordingly, the Court must conclude that plaintiff did satisfy her *Faragher* obligation by complaining to Henry about McGill's conduct and that such complaint should have put Waste Connections on notice to investigate and correct any harassing behavior. Henry admittedly took no action in response to plaintiff's complaint. Therefore, the Court concludes that Waste Connections is not entitled to the *Faragher* affirmative defense for purposes of disposing of this case on summary judgment.

     D.    <u>Retaliation</u>

Plaintiff finally claims that she was discharged in retaliation for complaining to Benson Henry about McGill's alleged sexual harassment. Waste Connections argues that plaintiff cannot satisfy the elements of a prima facie case of retaliation because she did not engage in protected activity and there is no causal connection between any protected activity and her termination. Further, Waste Connections argues that plaintiff cannot show that the rationale for her termination is a pretext for unlawful discrimination.

Title VII prohibits retaliation against an employee who "has opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). As with other types of discrimination claims, the analytical framework for retaliation cases involves three stages. First, the plaintiff must set

forth a prima facie case, which gives rise to an inference of discrimination.[4] *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action at issue. *Burdine*, 450 U.S. at 253. If the defendant meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is pretext for discrimination. *Id.*

In order to establish a prima facie case of retaliation, a plaintiff must establish the following elements: (1) that she engaged in protected activity; (2) that the defendant knew of this exercise of her protected rights; (3) that the defendant consequently took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 463 (6th Cir. 2001); *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831 (6th Cir. 1999).

Defendant's initial argument is that plaintiff cannot satisfy the first element of a prima facie case, specifically, that she engaged in activity protected by Title VII. By extension, defendant contends that because plaintiff did not engage in protected activity, she also cannot

---

[4]A plaintiff may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant or by showing the existence of circumstantial evidence which creates an inference of discrimination. *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995). Plaintiff has not alleged, and the record does not reveal, any direct evidence of retaliation, *i.e.*, evidence which proves the existence of a fact without any inferences or presumptions. *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 829 (6th Cir. 2000).

satisfy the second element of a prima facie case because Waste Connections did not have knowledge of such non-existent protected activity. However, it is undisputed that plaintiff verbally complained about McGill to Benson Henry. If such a complaint constitutes protected activity, Waste Connections, through its agent, would certainly have knowledge of the complaint. The parties do not dispute that plaintiff can satisfy the third element of a prima facie case. The plaintiff's termination is certainly a "materially adverse" employment action. *Ford v. General Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002) (quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). Finally, Waste Connections argues that plaintiff cannot show a causal connection between any protected activity and her termination, thus contending that she cannot satisfy the fourth element of a prima facie case.

Thus, the initial issue is whether plaintiff's verbal complaint to Henry constitutes protected activity such as to bring her within the protection of Title VII's anti-retaliation provision. Title VII prohibits retaliation against an employee who "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). These two provisions are commonly referred to as the opposition clause and the participation clause. The Sixth Circuit has held that "the instigation of proceedings leading to the filing of a complaint or a charge, including 'a visit to a government agency to inquire about filing a charge,' ... is a prerequisite to protection under the participation clause." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (internal citation omitted). Because Carver had not filed an

31

EEOC charge at the time of her complaint to Henry, nor was her complaint made as part of an investigation of another employee's EEOC charge or lawsuit, her complaint does not fall within the boundaries of the participation clause.

"[A]ny activity by the employee prior to the instigation of statutory proceedings is to be considered pursuant to the opposition clause." *Booker*, 879 F.2d at 1313. The issue of whether plaintiff's complaint to Henry constitutes opposition to unlawful employment discrimination is a closer question. Certainly the "opposition clause" does not protect all opposition activity. *Booker*, 879 F.2d at 1312. Waste Connections argues that plaintiff's complaint to Henry is insufficient to constitute opposition to an unlawful employment practice because "[a]n employee may not invoke the protections of the Act by making a vague charge of discrimination." *Id*. at 1313. *See Barrett v. Lucent Technologies, Inc.*, 36 Fed. Appx. 835, 842, 2002 WL 1272116 at *5 (6th Cir. June 6, 2002) ("While a communication may be protected even if it is vague or inartful, a plaintiff must still articulate opposition to what she reasonably believes to be unlawful activity.").

As noted above, plaintiff complained of McGill's "harassing behavior" and "hostility." Plaintiff also advised Henry that McGill had tried to persuade Kim Bankston to go on a date with him. While plaintiff's complaint does not provide much specificity beyond the buzzwords of "harassment" and "hostility" to indicate that she was complaining of treatment *because of her sex*, such terminology in the context of what she described to Henry would alert a reasonable manager that she was complaining about workplace harassment. *See, e.g., Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1007-1008 (6th Cir. 2000)

("An employee, of course, need not use the words 'pregnancy discrimination' to bring her speech within Title VII's retaliation protections. ... But she has to at least say something to indicate her pregnancy is an issue.").  The Court again concludes that plaintiff's complaint to Henry is sufficient to put Waste Connections on notice that she was complaining of sexual harassment.

With respect to the fourth element of a prima facie case of retaliation, defendant argues simply that plaintiff cannot satisfy the causal connection based solely on temporal proximity.  The Court notes, however, that there is some uncertainty in the case law on this point.  *Compare DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) ("this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise"), *and Nguyen v. City of Cleveland*, 229 F.3d 559,  567 (6th Cir. 2000) ("there may be circumstances where evidence of temporal proximity alone would be sufficient to support that inference [of a causal link]"), *with McElory v. Phillips Medical Sys. North Am., Inc.*, 127 Fed. Appx. 161, 162, 2005 WL 406335, at *10 (6th Cir. Feb. 18, 2005) ("temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim"), *and Steiner v. Henderson*, 2005 WL 221530, at *5 (6th Cir. Jan. 31, 2005) ("a plaintiff must provide *some* evidence beyond temporal proximity to demonstrate a retaliatory causal connection, especially where a defendant provides compelling evidence of alternative causation").  Here, given the temporal proximity of 27 days between the protected activity

33

and the adverse employment actions as to plaintiff, and further given plaintiff's assertion of McGill's changed attitude toward her following her complaint, the Court, for summary judgement purposes, finds that plaintiff also satisfies the fourth element of her prima facie case. *See Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 563 (6th Cir. 2004) ("the temporal proximity of these events is significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [plaintiff's] burden of demonstrating a prima facie case").

Assuming that plaintiff can establish a prima facie case of retaliation, Waste Connections must then articulate a legitimate, non-discriminatory reason for its decision to terminate her. Waste Connections has presented evidence that Carver was terminated because she dealt with a broker contrary to previous instructions and for altering contract documents in an attempt to receive a commission to which she was not entitled. The defendant has also submitted proof that the Knoxville office was ordered to reduce the number of sales staff and that Carver was selected for termination after her actions with the Nottingham North contract were discovered.

Once Waste Connections articulates a legitimate, non-discriminatory reason for plaintiff's termination, as it has done, the burden of production shifts back to plaintiff to show that such reason is a pretext for discrimination. A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Singfield*, 389 F.3d at 564; *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084

34

(6th Cir. 1994). Here, Carver complains that other employees were involved in what she terms "mistakes" related to submitting contracts for commission but were not subjected to any form of discipline. Carver further contends that, at best, there is conflicting information as to who was to handle broker accounts, and she claims that other employees made mistakes relating to account management but were not terminated as she was. Additionally, Carver cites examples of changes in behavior toward her by McGill following her complaint to management, and she contends it was McGill who ultimately recommended and played the significant role in Carver's termination shortly thereafter. Thus, Carver appears to be challenging defendant's true motivations as well as whether defendant's proffered reasons were sufficient to warrant such disciplinary action.

Defendant, on the other hand vigorously argues that the employees with whom Carver seeks to compare herself were not similarly situated to Carver in all relevant respects. *See Weigel v. Baptist Hosp. of East Tennessee*, 302 F.2d 367 (6th Cir. 202); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998). Defendant contrasts a mistake in the handling of an account by another employee with the altering of a contract and improper attempt to obtain a commission by Carver. Defendant further submits that Carver has presented no evidence that other sales representatives dealt with a broker after being instructed not to do so. Finally, defendant submits that its Knoxville office was directed to lay off some employees in response to the company's poor financial situation, and that after learning of plaintiff's conduct regarding the foregoing contract management decided to terminate plaintiff in lieu of another employee.

35

As recently articulated by the Sixth Circuit, courts have recognized that in retaliation (and discrimination) cases, an employer's true motivations are particularly difficult to ascertain. *Singfield*, 389 F.3d at 564. In fact, in *Singfield*, the Sixth Circuit expressed agreement with other circuit courts that "caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence." *Id*. The concluding discussion in *Singfield* is particularly apt here:

> The Housing Authority's true reasons for discharging [plaintiff] present an "elusive factual question," *Burdine,* 450 U.S. at 255 n. 8, 101 S.Ct 1089, incapable of resolution on summary judgment. In light of [plaintiff's] argument that the temporal proximity of the discrimination charge and his termination gives rise to an inference of retaliation, we conclude that he has satisfied the sufficiency standard at the summary judgment phase. Though [plaintiff] may fail at trial to establish his Title VII retaliation claim under the preponderance of the evidence standard, the district court erred in dismissing the Title VII retaliation claim at this stage.

*Id*. at 565. Against this legal background, the Court concludes that plaintiff herein has presented disputed issues of fact as to the question of pretext, and defendant is not entitled to summary judgment on plaintiff's claim of retaliation.

    E.    <u>Punitive Damages</u>

Waste Connections has also asked the Court to dismiss Carver's claim for punitive damages, relying on the rule in *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 545 (1999). In short, Waste Connections contends that Carver cannot recover punitive damages due to Waste Connections's "good faith efforts to comply with Title VII." *Id*. In light of the previous rulings and factual issues to be determined by the jury, the Court declines to dismiss

the claim for punitive damages at this time.  However, the Court will revisit this issue, if appropriate, at the close of plaintiff's proof at trial.


**III.     Conclusion**

For the reasons set forth herein, the defendant's motion for summary judgment will be granted in part and denied in part as to plaintiff's claim of hostile work environment discrimination such that plaintiff may proceed to trial as to all acts or omissions occurring after Waste Connections's October 2002 corporate acquisition of the Knoxville office. Defendant's motion for summary judgment as to plaintiff's claim of retaliation will be denied.  An order reflecting this opinion will be entered.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE